# 23-6379(L)

## 23-6953(CON)

*To Be Argued By*:
MARGARET GRAHAM

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket Nos. 23-6379(L), 23-6953(CON)

◄◄━◆◆◆━►►

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JAMES VELISSARIS, also known as Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

MARGARET GRAHAM,
NATHAN REHN,
*Assistant United States Attorneys,
Of Counsel.*

## TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  The Offense Conduct . . . . . . . . . . . . . . . . . .  2

    B.  The Guilty Plea . . . . . . . . . . . . . . . . . . . . . . .  6

    C.  The Motion to Withdraw . . . . . . . . . . . . . . .  8

    D.  The Sentencing and Restitution . . . . . . . .  10

ARGUMENT:

POINT I—The District Court Correctly Denied
    Velissaris's Motion To Withdraw His Plea . . .  13

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  13

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  15

POINT II—The District Court Correctly Calculated
    Restitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

    A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  28

    B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  29

    C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  30

POINT III—The District Court Correctly Calculated
    Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

ii

PAGE

# TABLE OF AUTHORITIES

*Cases*:

*Adames v. United States*,
    171 F.3d 728 (2d Cir. 1999) . . . . . . . . . . . . . . . . 17

*Blackledge v. Allison*,
    431 U.S. 63 (1977). . . . . . . . . . . . . . . . . . . . . . 15, 17

*Brown v. E.F. Hutton Grp., Inc.*,
    991 F.2d 1020 (2d Cir. 1993) . . . . . . . . . . . . 24, 25

*Dodds v. Cigna Securities, Inc.*,
    12 F.3d 346 (2d Cir. 1993) . . . . . . . . . . . . . . 24, 25

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002) . . . . . . . . . . . . . 23, 25

*Hunt v. All. N. Am. Gov't Income Tr.*,
    159 F.3d 723 (2d Cir. 1998) . . . . . . . . . . . . . . . . 23

*I. Meyer Pincus & Associates, P.C. v.*
    *Oppenheimer & Co.*,
    936 F.2d 759 (2d Cir. 1991) . . . . . . . . . . . . . 22, 24

*In re Bloomberg Finance L.P.*,
    Securities Act Release No. 11150, 2023 WL
    369464 (Jan. 23, 2023) . . . . . . . . . . . . . . . . . . . . 32

*Iowa Pub. Employees' Ret. Sys. v. MF Glob. Ltd.*,
    620 F.3d 137 (2d Cir. 2010) . . . . . . . . . . . . . . . . 23

*Irizarry v. United States*,
    508 F.2d 960 (2d Cir. 1974) . . . . . . . . . . . . . . . . 21

iii

PAGE

*Olkey v. Hyperion 1999 Term Tr., Inc.,*
    98 F.3d 2 (2d Cir. 1996) . . . . . . . . . . . . . . . . . 22, 24

*United States v. Avellino,*
    136 F.3d 249 (2d Cir. 1998) . . . . . . . . . . . . . 14, 27

*United States v. Boccagna,*
    450 F.3d 107 (2d Cir. 2006) . . . . . . . . . . . . . . . 29

*United States v. Botti,*
    711 F.3d 299 (2d Cir. 2013) . . . . . . . . . . . . . . . 33

*United States v. Doe,*
    537 F.3d 204 (2d Cir. 2008) . . . . . . . . . . . . . 14, 27

*United States v. Finazzo,*
    850 F.3d 94 (2d Cir. 2017) . . . . . . . . . . . . . . . . 31

*United States v. Gonzalez,*
    647 F.3d 41 (2d Cir. 2011) . . . . . . . . . . . . . . 15, 27

*United States v. Gonzalez,*
    970 F.2d 1095 (2d Cir. 1992) . . . . . . . . . . . . . . . 14

*United States v. Gramins,*
    939 F.3d 429 (2d Cir. 2019) . . . . . . . . . . . . . . . 19

*United States v. Gushlak,*
    728 F.3d 184 (2d Cir. 2013) . . . . . . . . . . . . . . . 29

*United States v. Hirsch,*
    239 F.3d 221 (2d Cir. 2001) . . . . . . . . . . . . . 15, 17

*United States v. Hyde,*
    520 U.S. 670 (1997). . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Kelly,*
    551 F.3d 171 (2d Cir. 2009) . . . . . . . . . . . . . . . 21

iv

PAGE

*United States v. Maher*,
    108 F.3d 1513 (2d Cir. 1997) . . . . . . . . . . . . . . . 17

*United States v. Overton*,
    24 F.4th 870 (2d Cir. 2022) . . . . . . . . . .  15, 22, 27

*United States v. Pipitone*,
    67 F.3d 34 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . 34

*United States v. Rivernider*,
    828 F.3d 91 (2d Cir. 2016) . . . . . . . . . . . . . . . . . 15

*United States v. Rose*,
    891 F.3d 82 (2d Cir. 2018) . . . . . . . . . . . . . . 14, 17

*United States v. Tanner*,
    942 F.3d 60 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 31

*Statutes & Rules:*

18 U.S.C. § 3663A . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Fed. R. Crim. P. 11(d)(2)(B) . . . . . . . . . . . . . . . . . . . 14

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket Nos. 23-6379 (L), 23-6953 (CON)

———————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JAMES VELISSARIS, also known as Sealed Defendant 1,

*Defendant-Appellant.*

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

### Preliminary Statement

James Velissaris appeals from a judgment of conviction entered on April 7, 2023, in the United States District Court for the Southern District of New York, following Velissaris's guilty plea.

Indictment 22 Cr. 105 (the "Indictment") was filed on February 16, 2022, in six counts. Count One charged Velissaris with securities fraud, in violation of 15 U.S.C §§ 78j(b) and 78ff, 17 C.F.R. 240.10b-5, and 18 U.S.C. § 2. Count Two charged Velissaris with investment adviser fraud, in violation of 15 U.S.C. §§ 80b-6 and 80b-17 and 18 U.S.C. § 2. Count Three charged Velissaris with wire fraud, in violation of 18

2

U.S.C. §§ 1343 and 2. Count Four charged Velissaris with making false statements to an accountant, in violation of 15 U.S.C §§ 78ff, 80a-29 and 7202, 17 C.F.R. 240.13b2-2, and 18 U.S.C § 2. Count Five charged Velissaris with conspiring to obstruct an investigation of the Securities Exchange Commission ("SEC"), in violation of 18 U.S.C. §371. Count Six charged Velissaris with obstructing an SEC investigation, in violation of 18 U.S.C. §§ 1519 and 2.

On November 21, 2022, Velissaris pleaded guilty to Count One pursuant to a written plea agreement with the Government.

On March 24, 2023, Velissaris moved to withdraw his guilty plea.

On April 7, 2023, the District Court denied Velissaris's motion to withdraw his guilty plea, sentenced Velissaris principally to 180 months' imprisonment, and ordered him remanded. On April 19, 2023, Velissaris filed a notice of appeal of his sentence and conviction.

Velissaris is serving his sentence.

## Statement of Facts

### A.   The Offense Conduct

Velissaris's guilty plea, conviction, and sentence resulted from his commission of a multi-year fraud at Infinity Q Capital Management LLC, where he was both

3

the Chief Investment Officer and majority owner. (PSR ¶¶ 13-46).[1]

Infinity Q was an investment advisement company headquartered in New York, New York. By February 2021, Infinity Q purported to manage approximately $3 billion in assets, including a registered mutual fund and a private hedge fund (the "Investment Funds"). (PSR ¶¶ 13-14).

Infinity Q charged management fees from the Investment Funds based on the amount of assets under management, and also received performance-based fees from the hedge fund. As the majority owner of Infinity Q, Velissaris earned tens of millions of dollars from these management and performance fees. (PSR ¶ 15).

From 2018 to 2021, Velissaris made false and misleading statements to investors and others concerning Infinity Q's process for valuing certain over the counter ("OTC") derivative securities that made up a substantial portion of the holdings of the Investment Funds, and fraudulently mismarked those securities

_____

[1] "PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Office ("Probation Office") in connection with Velissaris's sentencing; "Br." refers to Velissaris's brief on appeal; "A." refers to the appendix filed with that brief; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, quotations omit internal quotation marks, citations, alterations, and footnotes.

4

in ways that did not reflect their fair value. This in-cluded by adjusting the valuations generated by the independent valuation tool, Bloomberg Valuation Ser-vice ("BVAL") that Infinity Q told investors it was us-ing to value certain positions. (PSR ¶¶ 21-36). For ex-ample, Velissaris entered false information about the terms of the Investment Funds' OTC positions into the BVAL models, which negated the purported independ-ence of the BVAL and the accuracy of its valuations. (PSR ¶ 28). He also routinely mismarked OTC deriva-tive positions and altered their parameters in order to artificially inflate their values in BVAL. (PSR ¶ 29).

Velissaris manipulated the BVAL valuations to in-flate the value of the Investment Funds as reported to investors, to attract and retain capital in the Invest-ment Funds, and to increase his own compensation. (PSR ¶ 16).

Although Velissaris began making these manipula-tions as early as 2018, he substantially increased them in the spring of 2020 as markets were affected by the outbreak of the COVID-19 pandemic. As Velissaris and others at Infinity Q regularly discussed, a number of Infinity Q's competitors were forced out of business due to the pandemic and Infinity Q also had financial problems. But by inflating the apparent success of In-finity Q, Velissaris was able to attract substantial in-flows to the Investment Funds. (PSR ¶ 35).

In February 2021, after the mismarkings by Velis-saris were uncovered, Infinity Q liquidated the Invest-ment Funds and sold its OTC derivative positions. These positions were sold for hundreds of millions of dollars less than the purported market value that the

5

Investment Funds had been reporting to investors, and investors in the Investment Funds sustained substantial losses as a result. (PSR ¶ 36).

Prior to Infinity Q's collapse, Velissaris attempted to avoid detection of the scheme by providing falsified documents to an outside auditor of the Investment Funds. (PSR ¶ 38). For example, in September 2020, the auditor hired a specialist to analyze certain of the Investment Funds' positions, including a position that Velissaris had fraudulently mismarked. When the auditor asked Velissaris for the term sheet underlying that position, rather than provide the real term sheet and risk the auditor discovering his mismarking scheme, Velissaris provided a fraudulently altered term sheet. In the fraudulent term sheet, Velissaris had changed key terms, so that the auditor would reach a similar valuation number as that reported by Velissaris to investors. (PSR ¶ 38).

In 2020, the SEC began investigating the valuation practices at Infinity Q. In connection with its investigation, the SEC requested that Infinity Q provide various investor materials. Rather than provide the actual materials that had been shared with investors, Velissaris and another Infinity Q employee acting at Velissaris's direction altered significant portions of Infinity Q's materials, especially materials addressing Infinity Q's valuation practices and policies, before providing them to the SEC. (PSR ¶ 40).

Velissaris also submitted to the SEC purported minutes taken during meetings of Infinity Q's valuation committee in 2019 and 2020. In fact, no such

minutes had been taken during meetings, and Velissaris fabricated these "minutes." (PSR ¶ 43).

## B.    The Guilty Plea

On November 21, 2022, just one week before trial was scheduled to begin, Velissaris signed a written plea agreement with the Government (the "Plea Agreement"). In the Plea Agreement, Velissaris agreed to plead guilty to Count One, charging him with committing securities fraud from 2018 through 2021. (A. 407). The Plea Agreement stated that Velissaris's offense carried "a maximum term of imprisonment of 20 years" and that Velissaris "has accepted this Agreement and decided to plead guilty because he is in fact guilty." (A. 407, 411). The parties stipulated in the Plea Agreement that the loss exceeded $65 million, but was less than $150 million, and that the recommended sentence under the United States Sentencing Guidelines (the "Guidelines") was 235 to 240 months' imprisonment. (A. 408, 409). Velissaris agreed not to appeal any sentence within or below that range. (A. 409).

On November 21, 2022, Velissaris appeared before the District Court and pleaded guilty to Count One. After placing Velissaris under oath, the District Court established that Velissaris was competent to plead guilty. (A. 415-17). Velissaris confirmed that he had had a sufficient opportunity to discuss his case, the charge in Count One, and "the consequences of entering a guilty plea" with his counsel, and that he was satisfied with his counsel's representation. (A. 417).

The District Court advised Velissaris of the nature and elements of Count One, the maximum potential

7

penalties for that crime, and the waiver of his right to challenge a sentence at or below 240 months' imprisonment. (A. 420-24). The District Court also advised Velissaris that he would not be able to withdraw his guilty plea after it was entered, and he acknowledged that he understood. (A. 422-23).

Velissaris confirmed that he still wished to enter a guilty plea, and explained his guilt as follows:

> I made false statements of material fact to investors in the Infinity Q funds that I managed, and I did so knowingly, willfully, and with the intent to defraud. Specifically, I told investors that I was using an independent Bloomberg system to value the fund's over-the-counter derivatives. However, I was making manual adjustments in the system which increased the values of over-the-counter derivative positions that were reported. I knew that if I disclosed what I was doing, investors might have decided to redeem their investments or maybe would not have made the investments in the first place. Some of the communications with investors occurred over the phone and by email in the Southern District of New York. I acknowledge that my actions caused investors to lose money, and for this I am truly sorry.

(A. 424-25). In response to further inquiry by the District Court, Velissaris confirmed that he made the adjustments to "increase the value of the securities

8

being held by the fund" and that he knew what he was doing was wrong and against the law. (A. 426).

The District Court accepted the guilty plea, finding that it had been entered knowingly and voluntarily, that Velissaris had acknowledged that he was in fact guilty as charged in Count One, and that Velissaris was "aware of the consequences of [his] plea, including the sentence that may be imposed." (A. 427).

## C. The Motion to Withdraw

Sentencing was initially scheduled for March 3, 2023, and was subsequently adjourned until March 24, 2023. (Dkt. 82). On March 8, 2023, Velissaris's counsel notified the District Court that Velissaris wished to substitute new counsel. (Dkt. 84). On March 10, 2023, Judge Cote granted Velissaris's request and set a new sentencing date of April 7, 2023.

On March 24, 2023, Velissaris filed a motion to withdraw his plea, arguing primarily that he was factually innocent. (Dkt. 94). As relevant here, Velissaris argued that he was factually innocent of securities fraud, because Infinity Q disclosed to investors that it might depart from BVAL's valuation, and because the valuation models that Infinity Q used instead were "at all times reasonable." (Dkt. 94 at 9, 14). Velissaris also claimed that the four-month period between his guilty plea and the filing of his motion to withdraw was reasonable, and that the Government would not be prejudiced. (Dkt. 94 at 14-17). On the same day, Velissaris filed his sentencing submission, again asserting that he was innocent and requesting a sentence of home confinement. (Dkt. 92).

9

On March 31, 2023, the Government filed its sentencing submission, requesting a substantial prison sentence in light of the severity of Velissaris's fraud and the need to deter similar schemes. (Dkt. 112).

On April 6, 2023—the day before his scheduled sentencing—Velissaris filed a letter requesting an evidentiary hearing to contest the loss amount used to calculate the Guidelines, despite having stipulated to that calculation in the Plea Agreement and having not previously disputed the loss amount and Guidelines calculation in the Presentence Report. (Dkt. 113). The letter did not set forth a different loss range, but rather asked for an evidentiary hearing "to present competent evidence to refute the accuracy of the loss amount." (Dkt. 113 at 2). Velissaris requested a two-week adjournment of the sentencing to prepare for such a hearing. (Dkt. 113 at 1).

On April 7, 2023, the parties appeared before the District Court for sentencing. Judge Cote first heard from the parties on the pending motions and denied each orally, with a written opinion to follow concerning the motion to withdraw Velissaris's guilty plea. (Sent. Tr. 24-26, 31-33, 37-40).

In a subsequently-issued 58-page opinion, the District Court detailed the proceedings leading up to Velissaris's guilty plea and rejected several arguments for withdrawal of that plea that Velissaris does not raise on appeal. (A. 946-60). Judge Cote then turned to Velissaris's claim of actual innocence, explaining that nothing in his motion suggested that he was innocent of Count One. The District Court noted that the Government had charged Velissaris under two theories of

10

wire fraud: (i) what it termed the "Disclosure Theory," or lying to investors about Infinity Q's valuation process, including its use of BVAL as an independent valuation service, and (ii) what it termed the "Mismarking Theory," or going into BVAL and altering its code and inputs to artificially inflate the positions' valuation and thereby Infinity Q's reported net asset values ("NAVs"). (A. 962). The District Court noted that as an initial matter, Velissaris had all the information that he used to argue actual innocence at the time of his plea, and that "the defendant, represented by highly competent counsel, admitted his guilt even though aware of the documents that he now claims prove his innocence," which rendered his argument "futile." (A. 963.). The District Court then found that the "generalized disclosures" in the documents cited by Velissaris were not a defense to the Disclosure Theory, especially in light of Velissaris's admissions at his plea that he had made specific misrepresentations to investors about his use of BVAL. (A. 964-65). The District Court further found that these disclosures were similarly not a defense to the Mismarking Theory, because Velissaris's alterations were done to artificially increase the value of the positions, not to make the valuations more accurate. (A. 967-68). Judge Cote further held that Velissaris had not shown good cause for delaying his motion to withdraw his plea until shortly before sentencing, and that the Government would be unfairly prejudiced by allowing withdrawal. (A. 972-74). Judge Cote thus found all the relevant factors to weigh against allowing withdrawal of the plea. (A. 976).

11

### D.  The Sentencing and Restitution

After orally denying the motion to withdraw, the District Court proceeded to sentencing. Defense counsel confirmed that Velissaris had read the Presentence Report and discussed it with counsel. (Sent. Tr. 41). Velissaris objected to "all the factual allegations" set forth in the offense conduct, but otherwise voiced no objection to the Presentence Report, including the Guidelines calculations. (Sent. Tr. 41-42). Judge Cote then found that, given Velissaris's motion to withdraw his plea and his assertion of factual innocence, the credit for acceptance of responsibility accorded him in the Plea Agreement and the Presentence Report were no longer appropriate, meaning that the Guidelines range was now the statutory maximum of 20 years' imprisonment. (Sent. Tr. 44).

After hearing from the parties and allowing Velissaris to speak, the District Court analyzed the factors in 18 U.S.C. § 3553(a). Judge Cote discussed the "financial scale" of the fraud and "the amount of fraudulent activity"; the "extraordinary need to reflect in the sentence what is appropriate in terms of general deterrence"; and Velissaris's personal history and characteristics, which the District Court discussed at length. (Sent. Tr. 54-56).

The District Court sentenced Velissaris to 180 months' imprisonment, to be followed by three years' supervised release, and imposed forfeiture of $22 million, restitution to be determined at a later date, a fine of $50,000, and a $100 mandatory special assessment. (Sent. Tr. 56-57). The District Court remanded Velissaris pursuant to 18 U.S.C. § 3143 because Velissaris

12

had not shown by clear and convincing evidence that he was not a risk of flight, and there was not a substantial likelihood that the conviction would be overturned. (Sent. Tr. 58).[2]

In the weeks that followed the sentencing, the parties submitted further briefing on the appropriate restitution amounts, including on issues that are not raised here on appeal. (Dkt. 127, 129, 130). The District Court issued two written opinions on July 24 and August 3, (Dkt. 139, 143), and on August 3 issued an amended judgment with a final restitution amount of $125,969,962.78 (Dkt. 144). As relevant here, the restitution amount included $46,482,219 in overpayments to certain Infinity Q investors and $7,485,202 in excess management fees to Infinity Q based on the fraudulently inflated valuations. (A. 1020-21).

---

[2]  On April 19, 2023, Velissaris filed a motion for bail pending appeal in the District Court, which the District Court denied in a written opinion. (Dkt. 122, 123). Velissaris appealed the denial, and the Second Circuit denied his motion for bail pending appeal on August 30, 2023. *See United States v. Velissaris*, 23-6379, Dkt. 22.

13

## A R G U M E N T

### POINT I

### The District Court Correctly Denied Velissaris's Motion To Withdraw His Plea

Velissaris argues that the District Court abused its discretion when it denied his motion to withdraw his plea, because he was innocent of securities fraud. But this argument is roundly refuted by the record, which shows that Velissaris committed securities fraud both when he lied to investors about the independence of Infinity Q's valuation process and when he fraudulently altered Infinity Q's valuations to artificially inflate its reported NAVs. Further, this argument ignores Velissaris's plea allocution under oath—an allocution that was more than sufficient to make out securities fraud, and whose words he does not refute even now. The District Court did not abuse its discretion when it denied Velissaris's motion to withdraw his plea.

### A. Applicable Law

A guilty plea is a "grave and solemn act," not to be entered into or withdrawn lightly. *United States v. Hyde*, 520 U.S. 670, 677 (1997). Allowing a defendant to "withdraw his guilty plea simply on a lark" serves to "debase[ ] the judicial proceeding at which the defendant pleads and the court accepts his plea" and "degrade the otherwise serious act of pleading guilty into something akin to a move in a game of chess." *Id.* at 676-77. Thus, "[t]he standard for withdrawing a guilty plea is stringent because society has a strong interest

14

in the finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly administration of justice." *United States v. Rose*, 891 F.3d 82, 85 (2d Cir. 2018).

Once a guilty plea has been accepted, a district court may permit a defendant to withdraw it prior to sentencing only if the defendant can show "a fair and just reason" for doing so. Fed. R. Crim. P. 11(d)(2)(B). To assess whether a defendant has demonstrated a "fair and just" reason for withdrawing his plea, "a district court should consider, inter alia: (1) the amount of time that has elapsed between the plea and motion; (2) whether the defendant has asserted a claim of legal innocence; and (3) whether the government would be prejudiced by a withdrawal of the plea." *United States v. Doe*, 537 F.3d 204, 210 (2d Cir. 2008). The defendant "normally bears the burden of demonstrating both that there are valid grounds for withdrawal and that such grounds are not outweighed by any prejudice to the government." *United States v. Avellino*, 136 F.3d 249, 261 (2d Cir. 1998). "The Government is not required to show prejudice when opposing a defendant's motion to withdraw a guilty plea where the defendant has shown no sufficient grounds for permitting withdrawal." *United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir. 1992).

In this context, a defendant's admissions during a plea proceeding, and any findings made by the judge in accepting the plea, "constitute[] a formidable barrier" to challenging the validity of the plea, as they

15

"carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Where a defendant states under oath that his plea is knowing and voluntary, that he has been advised by and is satisfied with the representation of defense counsel, that he feels well enough to proceed, and that his plea is not the product of threats or undisclosed promises and representations, a district court is entitled to rely on those statements in rejecting a defendant's subsequent contradictory factual allegations. "A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea" and may be rejected summarily. *United States v. Hirsch*, 239 F.3d 221, 225 (2d Cir. 2001); *see also United States v. Overton*, 24 F.4th 870, 879 (2d Cir. 2022).

The decision whether to allow a requested withdrawal of a guilty plea is committed to the sound discretion of the district court. *See, e.g., United States v. Gonzalez*, 647 F.3d 41, 56 (2d Cir. 2011). This Court reviews "a district court's denial of a motion to withdraw a guilty plea for abuse of discretion and any findings of fact in connection with that decision for clear error." *United States v. Rivernider*, 828 F.3d 91, 104 (2d Cir. 2016).

## B. Discussion

Velissaris does not dispute that his sworn plea allocution provided the District Court with an adequate factual basis for the entry of a judgment of guilty, as required by Rule 11(b)(3). When pleading guilty, Velissaris acknowledged that he "made false statements of

16

material fact to investors in the Infinity Q funds that [he] managed, and [he] did so knowingly, willfully, and with the intent to defraud." (A. 425). He specifically admitted that he lied to investors by telling them "that I was using an independent Bloomberg system to value" Infinity Q's positions, when in fact he was "making manual adjustments in the system which increased the values" that were reported to investors. (A. 425). Velissaris also acknowledged the materiality of his misrepresentations to his investors, stating that he knew that if he disclosed his manual adjustments, "investors might have decided to redeem their investments or maybe would not have made the investments in the first place." (A. 425). Velissaris admitted that when he did this, he knew that he was doing something wrong and was violating the law. (A. 426).

Nor does Velissaris challenge the voluntariness of his plea, or claim that any part of his allocution was false, or that some newly discovered evidence or change in law warrants reconsideration of his plea. Instead, he now claims that he is factually innocent by arguing that a handful of statements in Infinity Q's documents—statements that were known to Velissaris at the time he voluntarily pleaded guilty—purportedly provided investors with enough information that Velissaris's other misrepresentations and omissions were not material. (Br. 32-33).

That argument fails for multiple reasons. First, by pleading guilty Velissaris acknowledged his factual guilt, and he cannot now simply contradict that by asking this Court to draw contrary factual inferences from certain documents. As Judge Cote recognized,

17

Velissaris was "aware of the documents that he now claims prove his innocence" at the time he admitted his guilt, and this "renders [his] argument about the documents futile." (A. 963). Velissaris identifies no new evidence or other changed circumstances that would permit him to disregard his own "[s]olemn declarations in open court." *Blackledge*, 431 U.S. at 74. Lacking any such evidence, he seeks to "simply contradict what he said at his plea allocution," which does not constitute "sufficient grounds to withdraw the guilty plea." *Hirsch*, 239 F.3d at 225 (2d Cir. 2001); *see also Adames v. United States*, 171 F.3d 728, 732 (2d Cir. 1999) ("A criminal defendant's self-inculpatory statements made under oath at his plea allocution carry a strong presumption of verity and are generally treated as conclusive in the face of the defendant's later attempt to contradict them."). Accordingly, his attempts to re-open factual contentions that he abandoned in pleading guilty do not meet the "stringent" standard for withdrawal of a guilty plea. *Rose*, 891 F.3d at 85.

Second, even if this Court were to consider the factual arguments that Velissaris previously abandoned in admitting his guilt, Judge Cote committed no error in rejecting his innocence claim. Velissaris bears a "heavy burden" in seeking to withdraw his plea, and this Court, "in reviewing the belated claims of innocence, must draw all permissible inferences in favor of the government and against the defendant." *United States v. Maher*, 108 F.3d 1513, 1530 (2d Cir. 1997). The arguments put forward by Velissaris do not come close to meeting that burden.

18

Velissaris's entire innocence claim rests on selective quotations from several Infinity Q documents that, he argues, "disclosed to investors . . . that Infinity Q had the discretion to depart from the prices provided by third-party models when it believed the model's prices did not represent fair value." (Br. 7). But as Judge Cote explained, Velissaris's argument on this point both "ignores his allocution and tries to redefine the nature of the crimes with which he was indicted." (A. 961). Velissaris was not indicted for, and did not plead guilty to, simply concealing the possibility that Infinity Q could adjust BVAL valuations to reflect "fair value." On the contrary, the Indictment expressly alleged that his representations about valuing the securities in the Investment Funds at "fair value" were false. (A. 28). The Indictment charged, and Velissaris himself admitted, that he engaged in a scheme to manipulate the valuation of securities and thereby inflate their value, in order to mislead his investors. (A. 24-25; A. 425-26).

Indeed, Velissaris's manipulations regularly "creat[ed] valuations that were not just false but mathematically impossible." (A. 25). An analysis conducted by the Government's expert witness, Dr. Faten Sabry, demonstrated this. As Judge Cote noted in rejecting Velissaris's motion to withdraw, for multiple positions held by the Investment Funds, Dr. Sabry found that Velissaris's alterations simply could not be justified. (A. 925). In some instances, Velissaris's alterations resulted in wildly different valuations for a position held in the mutual fund and the *exact same position* held in the hedge fund. (A. 925). In other instances, Velissaris generated a valuation that was mathematically

impossible. (A. 925).[3] On other occasions, Velissaris would alter a position to increase its value during its life, then back out of these alterations to bring the valuation down closer to market value in time for the position's settlement. To achieve these results, Velissaris repeatedly made undisclosed alterations to the BVAL models and also fed terms into those models that did not reflect the actual terms of the positions held by the Investment Funds. (A. 36). These alterations served to artificially inflate the reported value of the Investment Funds' positions. (A. 36). The fraudulent scheme did not merely involve adjustments meant to bring the valuations in line with "fair value," as Velissaris now argues in support of his bid to withdraw his plea. Accordingly, the Infinity Q disclosure documents authorizing "fair value" adjustments do not undercut the factual basis for his guilt.

On top of that, the Infinity Q documents that Velissaris cites were only one portion of the "total mix of information made available" to investors. *United States v. Gramins*, 939 F.3d 429, 445 (2d Cir. 2019). Velissaris repeatedly falsely promised investors that BVAL's valuations were independent of his own input. For instance, in an October 2016 email to Infinity Q's administrator, Velissaris stated: "We intentionally

---

[3]    While Velissaris claims that defense witness Dr. Atanu Saha supports his claim that BVAL was not properly valuing the positions, Dr. Saha never purported to show that the specific adjustments Velissaris made brought BVAL's valuations closer to fair market value. (A. 966).

20

removed ourselves from the valuation of these securities to allow BVAL to remain independent. . . . We also gain comfort because [when using BVAL] there is no discretion taken." (Dkt. 106 at 8). In an August 2016 email to Infinity Q's administrator and a member of the mutual fund's valuation committee, Velissaris stated that Infinity Q had not had "any input into [Bloomberg's] models, and they independently provide the values." (Dkt. 106 at 8). Thus, while Infinity Q's documents noted at a high level that Infinity Q might intervene in valuations after following a proscribed method, Velissaris repeatedly assured investors and key stakeholders that this was not happening and that he exercised "no discretion" in the valuation process. These misrepresentations provided an additional factual basis for his guilt.

Moreover, Velissaris did not follow the procedures that were set forth in the very documents that he now relies on as supposedly "disclosing" that he could make adjustments to valuations. As Judge Cote recognized, these documents promised that Infinity Q's valuation committee would meet to approve any such changes to valuations. (A. 965). Velissaris has not offered any evidence that the valuation committee ever approved his alterations. And in fact, when the SEC asked for minutes of the meetings of the valuation committee, Velissaris provided the SEC with falsified minutes. (A. 965). Velissaris also concealed his scheme from Infinity Q's auditor. When the auditor asked for the underlying contracts governing several positions, so that it could value the positions itself and thereby cross-check Infinity Q's valuations, Velissaris provided an altered contract. (A. 966). Thus, the disclosures to

21

investors that Velissaris now offers as evidence of his innocence did not disclose his actual conduct, and his attempts to conceal that conduct from the SEC and the auditor were themselves evidence of his guilt. *See United States v. Kelly*, 551 F.3d 171, 176 (2d Cir. 2009) ("A scheme to defraud may well include later efforts to avoid detection of the fraud."). There is simply no justification for this conduct, if Velissaris believed that he was doing what Infinity Q's documents allowed.

In his brief, Velissaris argues that this Court should not consider his fabrication of minutes and other documents, because Velissaris did not admit to this conduct during his plea. (Br. 39). But Velissaris stipulated in his plea agreement that an enhancement for obstructing justice was appropriate, which was based on his fabrication of documents sent to the SEC and the auditor. He did not dispute these facts in the District Court (A. 966 n. 16), and nor does he contest them in his brief on appeal. Velissaris instead argues that it was error for the District Court to consider these facts when denying his motion to withdraw, because these facts were not put on the record during the plea. But a District Court is not limited to the facts in the record at the time of the plea when considering a motion to withdraw. Velissaris cites *Irizarry v. United States*, but the holding in *Irizarry* was that only facts that were in the record at the time of the plea may be considered in determining "whether or not there was a sufficient factual basis for the plea." 508 F.2d 960, 967-68 (2d Cir. 1974). *Irizarry* says nothing about what a district court may consider when a defendant later argues factual innocence on the basis of evidence that was not presented at the time of the plea.

22

Here, Velissaris does not argue that Judge Cote lacked a factual basis to accept his plea at the time he entered the plea. Instead, Velissaris's entire motion to withdraw was based on purported evidence of his "innocence"—the Infinity Q disclosure documents he cites—that was not put on the record during the plea. It would be an odd rule of law to permit a defendant to introduce new facts in support of a motion to withdraw a plea, but to prevent the Government from providing additional factual detail in response to the defendant's motion to withdraw. Such a rule would essentially require the Government to create an extensive factual record at every guilty plea, simply to forestall a potential motion to withdraw that could be filed later by the defendant. It is thus no surprise that the law plainly permits a district court to consider evidence beyond the defendant's plea allocution in ruling on a motion to withdraw a plea. *See, e.g., Overton*, 24 F.4th at 878-79 (affirming district court's denial of motion to withdraw plea where district court relied on "the government's strong and direct evidence of the defendant's guilt," which included the government's proffer about expected testimony from law enforcement and other witnesses).

Velissaris also argues that the disclosures contained in the Infinity Q documents mean that his other misrepresentations were immaterial "as a matter of law," citing *I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co.*, 936 F.2d 759 (2d Cir. 1991), and *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996). (Br. 32-34). But those cases are both legally and factually distinct. Both *Pincus* and *Olkey* involved the "bespeaks caution" doctrine, which holds that a

23

"forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Employees' Ret. Sys. v. MF Glob. Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010); *see id.* at 142 n. 12 (citing *Pincus* and *Olkey* as examples of cases applying the "bespeaks caution" doctrine). Here, Velissaris was not charged with making misleading forward-looking statements about investment risks, but with making misrepresentations about the operations of the Investment Funds that he administered, and specifically with misrepresentations about how he manipulated the Investment Funds' asset valuations. (A. 965 ("The Government's theory was that the defendant did not disclose that, despite specific representations to the contrary, he manipulated BVAL's valuations to inflate artificially the value of Infinity Q's assets.")). This Court has repeatedly explained that misrepresentations about a firm's "operations in place (and present intentions as to future operations)" are not insulated by the bespeaks-caution doctrine. *Iowa Pub. Employees' Ret. Sys.*, 620 F.3d at 144; *see also Hunt v. All. N. Am. Gov't Income Tr.*, 159 F.3d 723, 728 (2d Cir. 1998) (investment fund managers' statements that they would use "hedging techniques" was an actionable misrepresentation despite cautionary language about these techniques in the investment prospectuses).[4] Thus, Velissaris cannot draw any support

_____

[4] The other cases cited by Velissaris were also "bespeaks caution" cases and thus do not support his claim to be shielded from liability based on his misrepresentations about his valuation process. *See Halperin*

24

from *Pincus* or *Olkey* or other similar cases applying the bespeaks-caution doctrine, given that his misrepresentations concerned how he performed valuations.

In addition to being based on a legal doctrine that has no application here, *Pincus* and *Olkey* are both factually distinguishable as well. In both cases, the court found that "exactly the 'fact'" that the civil plaintiffs claimed had been concealed was actually disclosed in the same document they claimed to have been misled by. *Pincus*, 936 F.2d at 762; *see also Olkey*, 98 F.3d at 5 (prospectus warned investors of "exactly the risk the plaintiffs claim was not disclosed"). Here, by contrast, the Indictment alleged, and Velissaris admitted, that he manipulated the valuation of securities in the Investment Funds by means of false representations and mismarking, but there was no evidence that his manipulation and mismarking were ever disclosed. Judge Cote expressly noted this factual distinction (A. 965), yet Velissaris ignores her straightforward reasoning in his brief on appeal.[5]

──────────

*v. eBanker USA.com, Inc.*, 295 F.3d 352, 359-60 (2d Cir. 2002) (applying "bespeaks caution" doctrine to affirm dismissal of claims alleging misleading disclosures of investment risks); *Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 350-51 (2d Cir. 1993) (allegation that fund misled about future investment risks); *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1031-32 (2d Cir. 1993) (same).

[5]   Velissaris's other citations (*see* Br. 34-35) are factually distinguishable for the same reason. *See*

25

Velissaris's final argument is to claim that he only admitted to inflating the value of the securities in his Investment Funds, and not to "artificially" inflating their value. (Br. 36-37). In Velissaris's telling, there was an "innocent explanation" for his undisclosed adjustments to the valuations, which is that he wanted to make them "more accurate." (Br. 37). But that argument cannot be squared with Velissaris's guilty plea and his allocution, much less with the full record that was before Judge Cote when she denied his motion to withdraw. To begin with, Velissaris pleaded guilty to Count One of the Indictment, which alleged that he made "false and misleading statements to investors" about the valuation of securities in the Investment Funds, that he "fraudulently mismarked those securities in ways that did not reflect their fair value," and that he "committed the mismarking scheme in order to inflate the value of the Investment Funds." (A. 24). When he appeared before Judge Cote to enter his guilty plea, she confirmed that he understood the nature of the charge to which he was pleading, and specifically asked him to confirm his understanding that Count One alleged that he made false representations to investors, fraudulently mismarked securities, and that he "mismarked the value of over-the-counter derivative positions held by those investment funds in

––––––––––

*Halperin*, 295 F.3d at 359-60 (prospectus "explicitly warned" of allegedly concealed risk); *Dodds*, 12 F.3d at 350-51 (prospectus warned plaintiff of risk she claimed was hidden from her); *Brown*, 991 F.2d at 1032-33 (same).

26

order to fraudulently inflate their value." (A. 420-21). Velissaris acknowledged that he understood this was the crime to which he was pleading guilty. (A. 421).

With that context in mind, Velissaris then allocuted to the crime in his own words. He acknowledged that he lied to investors about Infinity Q's valuation practices and that he made manual adjustments in the system to increase the reported values of positions, with the intent to defraud investors. (A. 425-26). He further explained that when he did this, he knew that he was doing something wrong and illegal. (A. 426). The plea allocution alone directly contradicts his claims that he did not admit to perpetrating a fraudulent scheme, but instead admitted merely to making good-faith attempts to arrive at a "more accurate" valuation. And as detailed above, Judge Cote had an ample additional factual record, including both expert testimony and documentary evidence of Velissaris's misrepresentations, which provided further support of her denial of his motion to withdraw his plea.

Likewise, Velissaris's invocation of the "legal impossibility" doctrine has no bearing on this case. (Br. 40-41). There is nothing "legally impossible" about committing securities fraud by making material misrepresentations about the value of securities and engaging in a scheme to mismark the value of securities with the intent to mislead investors. That is a textbook example of the crime of securities fraud, that is what was alleged in the Indictment, and that is what Velissaris admitted to doing.

Finally, Velissaris's brief does not even address Judge Cote's findings that both his four-month delay

27

in seeking to withdraw his plea, and the resulting prejudice to the Government, weighed against granting his motion to withdraw his plea. (A. 972-75). "Whereas a swift change of heart may indicate a plea made in haste or confusion," a delay of several months is a factor to be considered in denying a motion to withdraw. *Doe*, 537 F.3d at 213; *see also Overton*, 24 F.4th at 880 (five month delay was "substantial"). Judge Cote detailed the extensive prejudice to the Government that would result from granting the defendant's motion. (A. 973-75). The factors of delay and prejudice plainly weighed heavily against granting Velissaris's motion, and are themselves sufficient to affirm the District Court. *See Avellino*, 136 F.3d at 261 (defendant "normally bears the burden of demonstrating both that there are valid grounds for withdrawal and that such grounds are not outweighed by any prejudice to the government").

For all these reasons, Velissaris falls far short of showing that Judge Cote abused her discretion in denying the motion, and her well-reasoned decision should be affirmed. *See Gonzalez*, 647 F.3d at 56 ("The decision whether to allow the requested withdrawal [of a guilty plea] is committed to the sound discretion of the district court.").

## POINT II

### The District Court Correctly Calculated Restitution

Velissaris argues that the District Court abused her discretion when she based the restitution number on, in part, BVAL valuations. (Br. 41). Velissaris argues that because BVAL is not a sound methodology,

28

the restitution order should be vacated. But as the District Court correctly noted, BVAL valuations had been used to make actual payments that diminished the amount of money available to investors when Velissaris's fraud was exposed. Using those actual payments as the basis for a portion of the restitution award was plainly a reasonable methodology. Further, Velissaris has not established that, even absent these promises, the use of BVAL would be unreasonable.

## A. Relevant Facts

The total restitution award was more than $125 million, but the only portion of the restitution award that relied on BVAL was the Diversified Alpha Fund's ("DAF") calculation of overpayments to investors and excess management fees.[6] The DAF was the mutual fund that Infinity Q administered and managed, which at the time of restitution was in liquidation. (A. 1007). While the Fund had been operating, and before Velissaris's fraud was exposed, certain investors redeemed their shares based on the fraudulently inflated values reported by Velissaris. (A. 1009-10). In submitting its claim for restitution, the DAF compared the actual payments made using Velissaris's fraudulent BVAL valuations with how much those investors

—————

[6] The remainder of the restitution award was legal fees, fees to third parties, and overpayments to investors and excess management fees paid by the Volatility Alpha Fund, which were calculated using a third-party service called MarkIt, not BVAL. (A. 1020, 1022).

29

would have been paid if Infinity Q had used BVAL without any of Velissaris's fraudulent alterations (the "True BVAL Valuations"). (A. 1020). The total overpayment was $46,482,819. Because this amount was paid to investors who redeemed their investments before the fraud was exposed, this money was unavailable to Infinity Q's other investors after the DAF's collapse. The DAF also overpaid $7,485,202 in excess management fees to Infinity Q based on the fraudulently inflated valuations. (A. 1010). The District Court included this full amount in the restitution award.

## B. Applicable Law

The Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, "requires only a reasonable approximation of losses supported by a sound methodology." *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013). Although losses must be proved by a preponderance of the evidence, this "preponderance standard must be applied in a practical, common-sense way," and "[s]o long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution." *Id.* (internal citations omitted).

This Court "review[s] an MVRA order of restitution deferentially," and will "reverse only for abuse of discretion." *Id.* at 190 (quoting *United States v. Boccagna*, 450 F.3d 107, 113 (2d Cir. 2006)). "A district court abuses its discretion when a challenged ruling rests on an error of law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of

30

permissible decisions." *Id.* (internal quotation marks omitted).

## C. Discussion

Velissaris argues that the District Court did not reasonably approximate restitution because it did not follow a sound methodology when it based its calculations on BVAL's valuation of the positions. That argument fails.

First, the only portion of the restitution award that was based on BVAL was the DAF's overpayments and excess management fees, and this is therefore the only portion of the restitution award that the defendant can challenge in this appeal. The defendant has not challenged, for example, the VAF's use of MarkIt to calculate its own overpayments and excess management fees.

Velissaris argues that the District Court erred in relying on the DAF's calculations because BVAL is an unreliable valuation tool. But as Judge Cote noted in her opinion on restitution, the defendant himself chose BVAL as the tool that Infinity Q would use to value its positions, and he represented to investors that he would do so without substantive input from Infinity Q. (A. 1021). And, these restitution numbers were not hypothetical valuations—they represented actual overpayments that were made by the DAF. Specifically, the DAF allowed Infinity Q investors to redeem their shares on the basis of Velissaris's fraudulent overvaluations, and paid Infinity Q management fees on the basis of those overvaluations, when the correct redemption amounts and management fees should have

31

been far lower. This left much less money in the DAF to reimburse its remaining investors after the fraud was exposed, and that loss was directly attributable to Velissaris's fraud. It was therefore reasonable to base the restitution award on the difference between the artificially inflated valuation that was used to make these payments, and the True BVAL Valuation that Infinity Q claimed to be using to make these payments. The difference between the money that was actually paid out and therefore lost to the DAF and the money that the DAF should have paid out if not for Velissaris's fraud was a logical, elegant, and reasonable methodology for calculating harm.[7]

_____

[7] The cases cited by Velissaris are inapposite. (Br. 41-44). *Tanner* and *Finazzo* both involved kickback schemes, and the Second Circuit noted that in those scenarios, the kickback that a defendant received may not be an appropriate measure for the victim's loss. *See United States v. Tanner*, 942 F.3d 60, 67 (2d Cir. 2019); *United States v. Finazzo*, 850 F.3d 94, 117 (2d Cir. 2017). But the restitution amount at issue here was not calculated using the gain to the defendant. The restitution amount at issue here was calculated, as noted above, by comparing what the DAF would have paid if Velissaris had valued the positions as promised with what it in fact paid due to Velissaris's fraudulent valuation practices. Every dollar of those overpayments caused a loss to investors because it left less money in the DAF when it liquidated. This was a reasonable methodology, and *Tanner* and *Finazzo* do not suggest otherwise.

32

Further, even setting aside the defendant's own promises to investors as grounds for reasonableness, the defendant has not established that using BVAL, a reputable valuation tool offered by Bloomberg, was unreasonable. His arguments to the contrary, relying on an entirely unrelated SEC settlement with Bloomberg and a flawed defense expert report, fail.

The SEC's 2023 settlement with Bloomberg does not render BVAL unreasonable as a methodology, for two reasons. First, as noted above, Velissaris's investors were promised, and believed that they were receiving, BVAL valuations. Second, as the District Court noted in its order denying Velissaris's motion to withdraw his plea, the SEC's settlement with Bloomberg does not bear on this case. (Dkt. 116). The SEC fined Bloomberg for failing to disclose to clients how its Evaluator Input Tool ("EIT") worked to value fixed incomes securities. Order, *In re Bloomberg Finance L.P.*, Securities Act Release No. 11150, 2023 WL 369464, at *3 (Jan. 23, 2023). The positions in this case were not fixed income securities, and there is no evidence that EIT was used to price them. (A. 952). Further, as the District Court noted, the SEC settlement was about Bloomberg's failure to disclose how EIT worked, not that EIT was inaccurate. (A. 952). Indeed, the settlement noted that there was "no evidence that BVAL's prices [as valued through EIT] were erroneous or not reflective of the market." (A. 952). The SEC settlement therefore does not show that BVAL was an unreasonable methodology.

Last, Velissaris's witness Dr. Saha did not present evidence showing that BVAL was unreliable. As set

33

forth in the Government's motions in limine, the pur-
ported "error" Dr. Saha identified in BVAL's historic
scripts was not an error at all, but instead reflected
changes in trading practice. (Dkt. 55 at 18 n.4). Eval-
uating such evidentiary issues is exactly the province
of the District Court, and Velissaris's brief on appeal
provides no reason to conclude that Judge Cote com-
mitted any error, much less an abuse of discretion, in
deciding to accept the DAF's use of BVAL in calculat-
ing the restitution amount. Judge Cote was further
justified in adopting this methodology because neither
Dr. Saha nor the defendant proposed any alternative
method of valuation, or proposed a different restitu-
tion amount.

Accordingly, the District Court's methodology for
calculating the challenged portion of the restitution
award was sound, and the award should be affirmed.

### POINT III

#### The District Court Correctly Calculated Loss

Velissaris argues in passing that this Court should
remand to the District Court to "recalculate the loss
and to adjust his sentence as appropriate based on
more accurate loss . . . amounts." (Br. 50). Velissaris
does not cite any case law in support of his argument,
nor does he set forth the facts the Court needs to decide
the issue. This issue is therefore waived. *See United
States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013) ("It is
a settled appellate rule that issues adverted to in a
perfunctory manner, unaccompanied by some effort at

34

developed argumentation, are deemed waived." (internal citation omitted)).[8]

Even if Velissaris had adequately briefed the issue on appeal, his plea agreement bars him from raising the issue on appeal. Velissaris agreed to the applicable loss calculations in his plea agreement, and waived any challenge to the loss calculation and the resulting Guidelines enhancement. (A. 410). He cannot now attack the loss calculations, which fall within the express waiver of the right to appeal in his plea agreement. *See, e.g.*, *United States v. Pipitone*, 67 F.3d 34, 39 (2d Cir. 1995) (rejecting a challenge as precluded by the waiver in a plea agreement, noting that "[t]he government, this court, the public, and criminal defendants have legitimate interests in the integrity of the plea bargaining process and in the finality of sentences thus imposed").

Last, Velissaris's argument fails on the merits. Velissaris's sole challenge to the loss amount is that it improperly relied on BVAL to determine the fair value of positions. But for the same reasons set forth above,

---

[8]  Velissaris's arguments about restitution are not an adequate substitute, as loss and restitution were calculated using different methodologies. While it is true that the loss calculations and a portion of the restitution calculations relied in part on BVAL's valuation of the positions, there are nonetheless facts and arguments about the District Court's loss calculations that are unique to loss, and Velissaris's briefing on restitution is no substitute.

35

BVAL was a proper way to determine fair value for these purposes. And the District Court went beyond that at the sentencing proceeding and explained why, even if this were not the case, loss was appropriately calculated here. (Sent. Tr. 30-32). Velissaris does not engage with this thoughtful and detailed analysis on appeal, which was based on the 158-page report of the Government's expert. (Dkt. 36, Ex. 1). Nor could he. The District Court appropriately calculated loss, for the reasons set forth during the sentencing proceeding.

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:    New York, New York
          December 7, 2023

                        Respectfully submitted,

                        DAMIAN WILLIAMS,
                        *United States Attorney for the*
                        *Southern District of New York,*
                        *Attorney for the United States*
                        *of America.*

MARGARET GRAHAM,
NATHAN REHN,
     *Assistant United States Attorneys,*
          *Of Counsel.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 8,333 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: NATHAN REHN,
*Assistant United States Attorney*